IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Steve Randall Griffin, | ) | C/A No.: 1:14-229-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On February 4, 2011, Plaintiff filed an application for DIB in which he alleged his disability began on July 15, 2007. Tr. at 124–25. His application was denied initially and upon reconsideration. Tr. at 104–07, 110–12. On August 6, 2012, Plaintiff had a hearing

before Administrative Law Judge ("ALJ") John S. Lamb. Tr. at 54–99 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 5, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 27, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 49 years old at the time of the hearing. Tr. at 210. He completed the tenth grade. *Id.* His past relevant work ("PRW") was as a cleaner/janitor, a cleaning supervisor/cleaning manager, and a loader/material handler. Tr. at 65–66. He alleges he has been unable to work since April 4, 2011.[1] Tr. at 210.

2.    Medical History

a.    Pre-hearing medical evidence

On April 17, 2010, Plaintiff saw Cheryl B. Warner, Ph.D., for an initial assessment for individual counseling services. Tr. at 274. He complained of panic attacks, difficulty sleeping, and self-isolation. *Id.* Dr. Warner diagnosed social phobia and assessed a score

---

[1] Plaintiff alleged in his application for DIB a disability onset date of July 15, 2007. Tr. at 124. During the hearing, his attorney amended his alleged onset date to December 1, 2010, based on the fact that he initiated treatment with Dr. Wiley in December 2010. Tr. at 98. Plaintiff's attorney further amended Plaintiff's onset date to April 4, 2011, in her letter to the Appeals Council dated December 12, 2012. Tr. at 210.

of 55 on the global assessment of functioning ("GAF")[2] scale. *Id.* Plaintiff did not follow up with Dr. Warner. *Id.*

Plaintiff presented to Jill Kessler, APRN, on September 10, 2010, to obtain medication refills and to discuss decreasing his Xanax dosage and weaning from the medication. Tr. at 309. Ms. Kessler prescribed Zoloft and instructed Plaintiff to cut Xanax in half or skip dosages to wean himself from the medication. Tr. at 310.

Plaintiff followed up with Ms. Kessler on October 15, 2010, complaining that his anxiety symptoms had not improved with medication and that he had to take anxiety medication before his visit. Tr. at 304. Plaintiff reported that he had a panic attack while trying to wean off Xanax. *Id.* Ms. Kessler noted Plaintiff appeared anxious and apprehensive. Tr. at 305. She increased Plaintiff's Zoloft dosage from 50 mg to 75 mg and discussed switching him to Klonopin, but refilled Xanax instead because Plaintiff was not yet ready to switch to Klonopin. *Id.*

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.* However, the Fifth Edition of the *Diagnostic & Statistical Manual of Mental Disorders* ("*DSM-V*") does not include the GAF scale for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013. The *DSM-V* instead uses the World Health Organization's Disability Assessment Schedule ("WHODAS") to provide a global measure of disability.

On December 1, 2010, Plaintiff presented to Leigh Bostic, MSW, LISW-CP, for counseling. Tr. at 403–04. He reported difficulty socializing with others and inability to maintain a job. Tr. at 403. Ms. Bostic assessed generalized anxiety disorder and indicated a GAF score of 51. Tr. at 404.

Plaintiff presented to Dana Wiley, M.D., for psychiatric evaluation on December 7, 2010. Tr. at 224–25. He complained of daily panic attacks that occurred if he was not taking Xanax. Tr. at 224. Dr. Wiley diagnosed panic disorder without agoraphobia and assessed a GAF score of 60. Tr. at 225. He discontinued Xanax and prescribed 1 mg of Klonopin and 60 mg of Zoloft. *Id.*

Plaintiff followed up with Ms. Kessler on January 7, 2011, for medication refills. Tr. at 297–99. Ms. Kessler observed no abnormalities in mood, affect, behavior, coping skills, or sleep pattern. Tr. at 297. He denied suicidal ideation or attempt and changes in personality. *Id.* He endorsed daily anxiety, but indicated his panic attacks were under control. *Id.* Ms. Kessler indicated Plaintiff's mood and affect were appropriate. Tr. at 298.

On February 2, 2011, Dr. Wiley indicated Plaintiff denied auditory and visual hallucinations, delusions, and suicidal/homicidal ideations. Tr. at 219. Plaintiff was less depressed, but still demonstrated some anxiety. *Id.* Dr. Wiley prescribed 100 mg of Zoloft at bedtime and 1 mg of Klonopin, three times daily. *Id.*

On April 4, 2011, Plaintiff followed up with Dr. Wiley, who noted Plaintiff was filing for disability. Tr. at 223. Plaintiff complained of no psychosis, suicidal or homicidal ideations, or command psychosis. *Id.* Dr. Wiley indicated Plaintiff's mood was

4

more euthymic and that he complained of increased anxiety in the afternoons. *Id.* Dr. Wiley increased Plaintiff's Zoloft to 200 mg at night and increased his Klonopin to 2 mg. *Id.*

Plaintiff presented to Robin L. Moody, Ph.D., LPC, for a consultative evaluation on May 5, 2011. Tr. at 226–28. Plaintiff denied symptoms of depression, appetite changes, suicidal and homicidal ideations, delusions, and hallucinations Tr. at 226. However, he complained of sleep disturbance and endorsed symptoms of panic disorder, including intense fear or discomfort, racing heart, sweating, trembling/shaking, shortness of breath, chest pain, nausea, dizziness, feeling of detachment, fear of losing control, fear of dying, numbness in hands, fainting, chills, and hot flashes. Tr. at 226. Plaintiff indicated that he avoided grocery shopping and dining out and avoided leaving his home for as long as three months in the past. *Id.* Plaintiff scored 27 of 30 possible points on the Folstein Mini-Mental Status Examination. Tr. at 227. Dr. Moody indicated Plaintiff's "concentration, pace and persistence is adequate" and "[h]e can carry out simple instructions." Tr. at 228. Dr. Moody assessed panic disorder with agoraphobia and indicated a GAF score of 50. *Id.*

On May 11, 2011, Guillermo Ibarra, M.D., completed a psychiatric review technique in which he found that Plaintiff had an anxiety-related disorder that included panic disorder and panic attacks. Tr. at 230, 234. He indicated Plaintiff had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 238. Dr. Ibarra also completed a mental residual functional capacity ("RFC")

5

assessment in which he indicated Plaintiff was moderately limited with respect to the following abilities: work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 241–42. Dr. Ibarra further indicated Plaintiff "retains the ability to understand, remember, carry out and sustain routine tasks, under ordinary supervision." Tr. at 243. "He has marked limitation with ongoing interaction with the public." *Id.* "He is able to sustain low-pressure routine tasks, similar to those he did in the past." *Id.* "He is able to adapt to changes." *Id.*

On June 1, 2011, Plaintiff discussed his panic attacks with Dr. Wiley and indicated they were causing him to become more socially isolative and that he worried about panic attacks in between actual attacks. Tr. at 222. Plaintiff denied psychosis and suicidal or homicidal ideations. *Id.* He indicated he was depressed and that his symptoms of anxiety fluctuated. *Id.* Dr. Wiley prescribed 2 mg of Abilify at bedtime to treat Plaintiff's excessive worry. *Id.*

On June 8, 2011, Plaintiff reported to Ms. Bostic that he avoided socialization. Tr. at 402. He conveyed that he had recently lost a friend who was hit by a car and that another friend's mother had recently died, but that he was unable to attend the funerals. *Id.* He endorsed symptoms of panic, anxiety, and hyperventilation. *Id.*

Plaintiff presented to Ms. Bostic on July 6, 2011, complaining of a recent panic attack two weeks earlier when he saw someone he knew in a restaurant. Tr. at 401. He

reported tiredness, nightmares, increased weight and appetite, and decreased interest in playing the guitar and singing. *Id.*

State agency medical consultant Robert Estock, M.D., completed a psychiatric review technique on July 22, 2011, in which he assessed Plaintiff's impairment under Listing 12.06 for anxiety-related disorders. Tr. at 246–58. He indicated Plaintiff had panic disorder without agoraphobia, but did not meet the "B" criteria under the Listing because he had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 256. He further determined that the evidence did not establish the presence of the "C" criteria under the Listing. Tr. at 257. Dr. Estock completed a mental RFC evaluation in which he indicated Plaintiff was moderately limited with respect to the following: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting. Tr. at 260–61. Dr. Estock further specified the following:

7

> The claimant can understand, remember, and complete short, simple 1- to 2-step tasks. The claimant can follow simple directions in order to find locations and complete task. The claimant can maintain attention sufficiently to complete simple, 1- to 2-step tasks for periods of at least 2 hours, without the need for special supervision or extra rest periods. The claimant would not have any problem with the complexity of various tasks due to cognitive restraints, but may have some difficulty with the attention and concentration that is required. The claumant may be able to complete more complex tasks if they are broken down into smaller, simpler sections to be completed. The claimant appears able to complete an 8-hour workday, provided all customary breaks from work are provided. The claimant needs a flexible daily schedule. The claimant will benefit from supportive verbal reminders to stay on task. The claimant can tolerate non-intense interaction with members of the general public. The claimant can ask questions and request assistance. The claimant can tolerate casual, non-intense interaction with coworkers and supervisors. The claimant is likely to do best working with a small number of familiar coworkers. Supervision and criticism should be given in a manner that is supportive and non-threatening. Changes in the work environment or expectations should be infrequent and introduced gradually. The claimant can maintain basic awareness of safety issues in the work place.

Tr. at 262.

Plaintiff followed up with Dr. Wiley on July 27, 2011, and reported experiencing depression and social anxiety that caused him to stay in his home. Tr. at 264. Plaintiff reported no suicidal or homicidal ideations or acute psychosis. *Id.* Dr. Wiley discontinued Zoloft and prescribed Viibryd for depression. *Id.* However, Dr. Wiley discontinued Viibryd and prescribed Zoloft again on August 9, 2011. Tr. at 265.

On August 24, 2011, Plaintiff complained to Dr. Wiley that he was feeling more depressed and lethargic. *Id.* He denied experiencing hallucinations, delusions, suicidal ideations, homicidal ideations, and command psychosis. *Id.* He indicated that he was feeling anxious and worried, but Dr. Wiley noted that his concentration was improved. *Id.* Dr. Wiley increased Plaintiff's Zoloft prescription to 200 mg. *Id.*

8

Plaintiff followed up with Dr. Wiley on October 24, 2011, complaining of poor memory, poor concentration, poor sleep, and mood fluctuations between depression and anxiety. *Id.* He denied acute psychosis and suicidal and homicidal ideations. *Id.* Dr. Wiley prescribed Ambien to improve Plaintiff's sleep. *Id.*

Plaintiff saw Ms. Bostic on November 21, 2011, and reported increased energy and feeling jittery and nervous inside. Tr. at 400. He endorsed symptoms including forgetfulness and nightmares. *Id.*

On January 14, 2012, Plaintiff informed Ms. Bostic that he had spent three days in bed over the Christmas holiday. Tr. at 399. He indicated he was unable to sit or concentrate and was experiencing night sweats and nightmares. *Id.*

Plaintiff presented to Marian B. Clinch, M.D., to establish primary care on January 14, 2012. Tr. at 267–69. Plaintiff complained of nasal congestion, heartburn, and anxiety. Tr. at 267. Plaintiff reported good compliance with psychiatric treatment and good symptom control. *Id.*

On January 23, 2012, Plaintiff complained to Dr. Wiley of recurrent, spontaneous panic attacks that affected his ability to function outside of his home. Tr. at 266.

Plaintiff indicated to Ms. Bostic on February 6, 2012, that he had no desire to complete any projects. Tr. at 398. He reported nightmares and decreased concentration and focus. *Id.*

On April 11, 2012, Plaintiff informed Ms. Bostic that he was having a good day, but that he recently had nightmares about snakes. Tr. at 397. He reported increased heart rate, periods of both increased and decreased sleep, and decreased appetite. *Id.* He

complained of increased panic, constant depression, negative outlook, and lack of interest in going anywhere or doing anything. *Id.*

Plaintiff complained to Dr. Wiley of panic attacks accompanied by tremors and sweating on April 18, 2012. Tr. at 266. He indicated that he was also having poor sleep and nightmares. *Id.* He denied hallucinations, delusions, and suicidal and homicidal ideations. *Id.* Dr. Wiley noted that Plaintiff was still depressed and that his affect was anxious. *Id.* Dr. Wiley discontinued Ambien and Klonopin, prescribed Restoril 30 mg for sleep and Valium 10 mg for anxiety, and increased Plaintiff's dosage of Abilify to 5 mg. *Id.*

On May 9, 2012, Plaintiff complained to Ms. Bostic that Valium was not helping. Tr. at 396. He indicated he was drowsy "all the time," but could not sleep at night. *Id.* He also complained that his heart was racing. *Id.* Plaintiff indicated that he could sit and talk with his wife, go to the door, or go out in the yard, but could not go to restaurants or drive. *Id.*

On July 17, 2012, Plaintiff followed up with Dr. Wiley, who noted Plaintiff continued to have spontaneous episodes of panic that caused him to be socially withdrawn and to have impaired memory and concentration. Tr. at 394. Plaintiff complained of experiencing side effects with Valium. *Id.* Dr. Wiley observed Plaintiff's mood to be anxious, his affect to be blunted, and his concentration to be poor. *Id.* He discontinued Plaintiff's prescription for Valium. *Id.*

On July 25, 2012, Dr. Wiley provided a statement indicating that "[t]he limitations and opinions reflected on the Psychiatric Review Technique and Medical Source

Statement (mental) forms which I have completed have been present since I first began treating this patient in December 2010, and most probably present since at least December 1, 2010." Tr. at 373. Dr. Wiley also wrote a letter in which he indicated he was treating Plaintiff for panic disorder, NOS and mood disorder, NOS and that he continued to experience severe, recurrent panic attacks. Tr. at 374. Dr. Wiley specified Plaintiff's panic attacks, mood swings, and insomnia significantly impaired his ability to interact appropriately with others, demonstrate reliability, or handle normal work stressors. *Id.* He wrote that Plaintiff's poor concentration impaired his ability to process, retain, and utilize information. *Id.* Dr. Wiley further noted "[i]n my clinical opinion, Steve Griffin is unable to work on either on a full or part-time basis without significant interference from his chronic and recurrent psychiatric symptoms." Tr. at 375. Dr. Wiley indicated that Plaintiff's impairments met Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. Tr. at 376. He specified that Plaintiff had a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, deceased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. Tr. at 379. He indicated Plaintiff had anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by recurrent, severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. Tr. at 381. Dr. Wiley indicated Plaintiff had moderate restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and

three episodes of decompensation, each of extended duration. Tr. at 386. He noted that Plaintiff could occasionally use judgment; interact with supervisors; and understand, remember, and carry out simple job instructions. Tr. at 390–91. He indicated Plaintiff could rarely follow work rules; relate to co-workers; deal with the public; deal with work stresses; function independently; understand, remember, and carry out detailed, but not complex, job instructions; behave in an emotionally-stable manner; relate predictably in social situations; and demonstrate reliability. *Id.* He noted Plaintiff could never maintain attention/concentration or understand, remember, and carry out complex job instructions. *Id.* Dr. Wiley further indicated Plaintiff could not consistently attend work at least 18 days out of 20; would need to take unscheduled work breaks, due to interruptions from psychiatrically-based symptoms; and was likely to decompensate under the stress of a simple, routine work load of forty hours a week. Tr. at 393.

b.    Post-hearing medical evidence

On September 12, 2012, Plaintiff complained to Dr. Wiley of recurrent panic attacks and reported being nervous in the waiting room while waiting for the appointment. Tr. at 406. Dr. Wiley indicated Plaintiff's mood was depressed, his affection was anxious, and his concentration was poor. *Id.*

Plaintiff presented to Dr. Wiley on November 12, 2012, complaining of recurrent panic attacks resulting in depression and low self-esteem. Tr. at 405. Plaintiff's memory was intact and his concentration was good, but his mood and affect were anxious. *Id.*

On November 30, 2012, Dr. Wiley provided a supplemental statement indicating Plaintiff had shown a poor response to treatment and had demonstrated a worsening of

12

his social anxiety and agoraphobia since at least April 4, 2011. Tr. at 407. He estimated Plaintiff's GAF score to be 45–50. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on August 6, 2012, Plaintiff testified that he had anxiety and panic attacks, which occurred three or more times per week. Tr. at 68, 76. He described feeling "out of" his body when experiencing a panic attack. Tr. at 76. He stated his panic attacks lasted as long as one hour. Tr. at 81. Plaintiff indicated that, after a panic attack, he felt completely drained for two to three days, could not think clearly, and had a bad headache. *Id.* He indicated he had difficulty sleeping and experienced shaking when he did not take his medication. Tr. at 68. Plaintiff stated he experienced chest pain a couple times per week. Tr. at 76.

Plaintiff testified that the unpredictability of his panic attacks prevented him from performing his past work as a cleaner. Tr. at 71.

Plaintiff testified that he lived with his wife. Tr. at 72. He stated he rarely left his house. *Id.* He indicated he sometimes had problems controlling his anger and interacting appropriately with others in public. Tr. at 78. He testified he performed household chores that included washing dishes and mowing the lawn. Tr. at 72–73.

Plaintiff testified that he lost approximately 100 pounds because he stopped eating. Tr. at 74–75.

13

### b.    Witness's Testimony

Plaintiff's wife, Linda Griffin, appeared and testified at the hearing. Tr. at 85–90. She indicated that she had been married to Plaintiff for five years. Tr. at 86. Mrs. Griffin stated that when she first met Plaintiff, he would drink alcohol before going out in public. *Id.* She indicated that Plaintiff self-medicated with alcohol to function socially. Tr. at 90. She stated that after he stopped drinking, he would not leave the house or talk to anyone. Tr. at 86–87. She stated that he started having panic attacks. Tr. at 87. Mrs. Griffin testified that Plaintiff started seeing Dr. Wiley and was prescribed medications in 2010. Tr. at 86–87. She indicated that Plaintiff still had difficulty speaking with people and that he would not answer the telephone. Tr. at 87. Mrs. Griffin indicated Plaintiff kept the doors closed and the shades drawn and was very paranoid. Tr. at 90. She testified that Plaintiff's medications reduced his energy. Tr. at 88. She stated that Plaintiff had difficulty sleeping and frequently paced through the house during the night. *Id.*

Mrs. Griffin testified that Plaintiff frequently forgot to perform the chores that she left for him. Tr. at 88. She stated that she had to feed the pets and prepare Plaintiff's medications because of Plaintiff's forgetfulness. *Id.*

Mrs. Griffin testified that Plaintiff was unable to perform his past job as a cleaner because of his panic attacks, which were unpredictable and caused Plaintiff to fall apart. Tr. at 90.

### c.    Vocational Expert's Testimony

Vocational Expert ("VE") Carey Washington, Ph.D., reviewed the record and testified at the hearing. Tr. at 65–67, 91–94, 96–97. The VE categorized Plaintiff's PRW

as a cleaner/janitor, *Dictionary of Occupational Titles* ("*DOT*") number 381.687-014, as heavy with a specific vocational preparation ("SVP") of two; a cleaning supervisor/cleaning manager, *DOT* number 381.137-010, as medium with a SVP of six; and a loader/material handler, *DOT* number 929.687-030, as heavy with a SVP of three. Tr. at 65–66. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to simple, routine, repetitive tasks; would benefit from supportive, verbal reminders to stay on task; would need a flexible daily schedule; could only tolerate non-intensive interaction with members of the general public; would be best at working with a small number of familiar coworkers; and would require that changes in a work environment or expectations be infrequent and introduced gradually. Tr. at 66–67. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a cleaner. Tr. at 67. The ALJ asked if the job as a cleaner was typically performed individually or as part of a team. Tr. at 91. The VE testified that the work was typically performed as part of a team. *Id.*

Plaintiff's attorney asked the VE if the job as a cleaner could be performed if the individual could occasionally not remember and carry out simple instructions; did not use good judgment; and could never carry out detailed instructions. Tr. at 92. The VE testified that such an individual would be unable to perform the job as a cleaner or any other job. *Id.* Plaintiff's attorney asked if an individual would be able to perform substantial gainful activity if he were performing a simple job, but had to miss work at least three days per month. *Id.* The VE testified that the individual would be incapable of engaging in substantial gainful activity. *Id.* Plaintiff's attorney asked the VE if there

would be any jobs an individual could perform if he could only occasionally handle work stressors and could only occasionally process, retain, and utilize information due to poor concentration. Tr. at 94. The VE testified that there would be no substantial gainful work activity that an individual with such limitations could perform. *Id.* Plaintiff's attorney asked the VE to assume an individual with a GAF score of 50, could only occasionally carry out simple instructions and only occasionally maintain concentration, pace, and persistence on the job. Tr. at 96. Plaintiff's attorney asked if this individual could perform any jobs. *Id.* The VE indicated that he could not. Tr. at 97.

2.      The ALJ's Findings

In his decision dated October 5, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since December 1, 2010, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairment: anxiety with panic attacks (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but he will have additional nonexertional limitations. He is limited to simple, routine, repetitive tasks. He will benefit from supportive verbal reminders to stay on task. He will need a flexible daily schedule. He can only tolerate non-intensive interaction with the general public. He will work best with only a small number of co-workers. Any changes in the work environment should be infrequent and introduced gradually.

6.    The claimant is capable of performing past relevant work as a cleaner/janitor (Dictionary of Occupational Titles reference number 381.687-014). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2010, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 20–26.

D.    Appeals Council Review

The Appeals Council issued a notice denying Plaintiff's request for review of the ALJ's decision on January 3, 2014. Tr. at 1. It indicated that it considered the additional evidence and the reasons Plaintiff disagreed with the decision, but found that the information did not provide a basis for changing the ALJ's decision. Tr. at 1–2.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ's step two and step three findings were not supported because the ALJ erroneously rejected the opinions of a treating and examining physician in favor of the opinion of a non-examining consultant;

2)    the ALJ failed to make specific findings regarding the physical and mental demands of Plaintiff's PRW as required by SSR 82-62; and

3)    the Appeals Council failed to evaluate Dr. Wiley's opinion.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

    1.    Medical Opinions

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, *quoting* 20 C.F.R. §§ 404.1527(a)(2). If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record).

Pursuant to SSR 96-2p:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.

SSA rules require that the ALJ carefully consider medical opinions on all issues. SSR 96-5p. Pursuant to 20 C.F.R. § 404.1527(c), if a treating source's opinion is not

accorded controlling weight, the ALJ should consider "all of the following factors" to determine the weight to be accorded to every medical opinion in the record: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability; consistency with the record as a whole; specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654. The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R. §§ 404.1527(e)(2)(ii). In all unfavorable and partially-favorable decisions and in fully-favorable decisions based in part on treating sources' opinions, the ALJ must include the following:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.

SSR 96-2p.

In view of the foregoing authorities, the court considers the ALJ's treatment of the opinions of Drs. Wiley, Moody, and Estock.

### a.    Dr. Wiley's Opinion

Plaintiff argues that the ALJ failed to properly evaluate the opinion of his treating physician, Dr. Wiley. [ECF No. 18 at 7]. Plaintiff maintains that Dr. Wiley's opinion supports a finding that Plaintiff had a Listings-level psychiatric impairment. *Id.* at 12.

The Commissioner argues that the ALJ appropriately rejected Dr. Wiley's opinion because it was inconsistent with his examination notes and the GAF score that he assessed. [ECF No. 20 at 12].

The ALJ indicated the following with respect to Dr. Wiley's opinion:

The undersigned rejects the functional capacity assessment of Dr. Wiley (13F). The "marked" impairments in social functioning and concentration, persistence, or pace are not consistent with examination results, and certainly not consistent with the GAF score of 60. Indeed, Dr. Wiley assigned the highest GAF score among the several doctors. The "marked" limits thus rely on the claimant's recitation of symptoms rather than standardized clinical measures. There is no evidence to support the episodes of decompensation mentioned by Dr. Wiley.

Tr. at 25.

The undersigned recommends a finding that the ALJ failed to adequately consider Dr. Wiley's opinion. Dr. Wiley's opinion, as the opinion of a treating physician, was presumably entitled to deference. *See* SSR 96-2p. Although the ALJ provided several reasons for determining it was not entitled to controlling weight, the ALJ failed to analyze Dr. Wiley's opinion based on the factors set forth in 20 C.F.R. § 404.1527(c). He acknowledged the examining relationship, specialization, and the treatment relationship to some extent when he noted Dr. Wiley was the treating psychiatrist who began treating Plaintiff in December 2010. Tr. at 23. He also addressed the consistency of Dr. Wiley's opinion with the record as a whole when he addressed perceived differences between Dr. Wiley's assessment and those of Drs. Moody, Estock, and Ibarra. *See* Tr. at 25. However, the ALJ did not acknowledge the frequency and nature and extent of Plaintiff's treatment with Dr. Wiley, which the record reflects to have consisted of visits approximately every two to three months between December 2010 and July 2012. *See* Tr. at 219, 222, 223, 224–25, 264, 265, 266, 394. Although the ALJ concluded that Dr. Wiley's opinion was not supported by his treatment records, the ALJ's conclusion is not sustained by the

record. The ALJ explained that he rejected Dr. Wiley's opinion because marked impairments in social functioning and concentration, persistence, and pace were not consistent with Dr. Wiley's examination results or with the GAF score of 60 that he assessed. *See* Tr. at 25. However, the ALJ referenced an absence of symptoms such as hallucinations, delusions, suicidal ideations, and psychosis—none of which were consistent with Plaintiff's diagnosed impairment of anxiety with panic attacks. The ALJ failed to consider symptoms consistent with Plaintiff's impairment, including social isolation, worry, impaired memory, poor concentration, and sleep disturbance. Tr. at 264, 265, 266, 394. The ALJ also neglected to consider that Dr. Wiley often had to adjust Plaintiff's medications in an attempt to better address symptoms of depression and anxiety. *See* Tr. at 222, 223, 264, 265, 266, 394. Additionally, the ALJ failed to address corroborative evidence from Ms. Bostic, who provided counseling service to Plaintiff in Dr. Wiley's office. *See* Tr. at 70, 396–404. The undersigned recommends a finding that the ALJ failed to give deference to Dr. Wiley's opinion and to carefully consider evidence that supported his opinion in accordance with 20 C.F.R. § 404.1527, SSR 96-2p, and SSR 96-5p.

b.    Dr. Moody's Opinion

Plaintiff argues that the ALJ improperly dismissed Dr. Moody's opinion. [ECF No. 18 at 12].

The Commissioner argues that the ALJ appropriately gave some weight to Dr. Moody's opinion that Plaintiff would be able to carry out simple instructions because it was supported by the record. [ECF No. 20 at 12]. However, the Commissioner contends

that the ALJ properly gave little weight to Dr. Moody's assessment that Plaintiff had a GAF score of 50 because it was inconsistent with the examination notes and was based on Plaintiff's subjective complaints. *Id.*

The ALJ accorded "some weight" to Dr. Moody's opinion, "[t]o the extent she supports the ability to perform simple work tasks and maintain adequate concentration, persistence, or pace." Tr. at 25. The ALJ indicated that he gave little weight to Dr. Moody's GAF score, which was "not consistent with the overall examination results, and appears based largely on the claimant's subjective complaints." *Id.* He also indicated "[t]he consultative examiner assigned this score, but noted good memory, adequate concentration, persistence, and pace, the ability to carry out simple tasks, and the ability to manage funds." *Id.*

The undersigned recommends a finding that the ALJ failed to carefully consider Dr. Moody's opinion in accordance with SSR 96-5p and the factors set forth in 20 C.F.R. § 404.1527(c). The ALJ particularly neglected to consider the supportability of Dr. Moody's opinion. The ALJ accorded some weight to that portion of Dr. Moody's opinion that was consistent with his RFC assessment, but he dismissed the GAF score she provided as being inconsistent with her assessment and based largely on Plaintiff's subjective complaints. *See* Tr. at 25. The undersigned's review of the GAF scale does not suggest that a GAF score of 50 was incompatible with Dr. Moody's observations and other aspects of her opinion. According to the Fourth Edition, Text Revision of the *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM*-IV-TR"), the GAF scale indicates that GAF scores between 41 and 50 indicate "serious symptoms (e.g., suicidal

ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association: *DSM*-IV-TR. Although Dr. Moody's evaluation notes do not suggest Plaintiff had the serious symptoms specified in the *DSM*-IV-TR, they do suggest that Plaintiff had serious impairment in social functioning, based on Plaintiff's claims that he avoided grocery shopping and dining out and had avoided leaving his home for as long as three months in the past. *See* Tr. at 227–28. While the ALJ suggested that the GAF score assessed by Dr. Moody was entitled to little weight because it was based largely on Plaintiff's subjective complaints, the undersigned posits that, as a psychologist performing a one-time consultative evaluation, Dr. Moody was unable to base her opinion on anything other than her observations and Plaintiff's responses to her questions. *See* Tr. at 25. This is true for most opinions based on consultative examinations because such brief encounters allow the physicians and psychologists to rely on little else. Furthermore, the ALJ ignored the consistency between the GAF score assessed by Dr. Moody and that assessed by Ms. Bostick. *See* Tr. at 404. Therefore, the undersigned recommends a finding that the ALJ failed to carefully consider Dr. Moody's opinion.

c.    Dr. Estock's Opinions

Plaintiff argues that the ALJ improperly accorded the greatest weight to Dr. Estock's opinion, despite the fact that Dr. Estock never examined him and that his opinion was not based on a review of the entire record. [ECF No. 18 at 13].

The Commissioner argues that the ALJ's reliance on Dr. Estock's opinion was appropriate under the provisions of 20 C.F.R. § 404.1527(e) and was consistent with the evidence as a whole, including Dr. Ibarra's opinion. [ECF No. 20 at 11].

The ALJ provided that he accorded the greatest weight to Dr. Estock's opinion because it was most consistent with the evidence as a whole. Tr. at 25.

In light of the above recommendations regarding the opinions of Drs. Wiley and Moody, the undersigned recommends a finding that the ALJ's reliance on Dr. Estock's opinion is not supported by substantial evidence. Dr. Estock's opinion was inconsistent with other opinions in the record, including those of Drs. Wiley and Moody, and consistency with the record is an important factor under 20 C.F.R. § 404.1527(c). Dr. Estock was neither a treating nor examining physician, which is another factor to be considered when assessing medical opinions. *See* 20 C.F.R. § 404.1527(c). Additionally, Dr. Estock's opinion was based upon an incomplete record. At the time that Dr. Estock reviewed Plaintiff's record, it was devoid of counseling notes from Ms. Bostic, which were submitted after Plaintiff's hearing, and which provided greater detail about Plaintiff's daily functioning. *See* Tr. at 396–404. The record before the ALJ also contained approximately one year of treatment notes from Dr. Wiley for the period after Dr. Estock's opinion was rendered. See Tr. at 264–66, 373–95. In light of all of the foregoing, the ALJ's reliance on Dr. Estock's opinion was misplaced.

2.    PRW

Plaintiff argues that the ALJ summarily concluded that he could return to PRW as a cleaner without making specific findings about the physical and mental limitations of

that work. [ECF No. 18 at 13]. Plaintiff maintains that the ALJ did not follow the requirements of SSR 82-62 because the he failed to discuss medical evidence of impairments related to Plaintiff's ability to meet the requirements of his past work and his statements as to which past work requirements he could no longer meet. *Id.* at 15.

The Commissioner argues that the ALJ properly evaluated his claim at step four. [ECF No. 20 at 13]. The Commissioner contends the ALJ concluded Plaintiff had the RFC to perform a range of unskilled work, compared Plaintiff's RFC with the physical and mental demands of his past work as a cleaner, considered Plaintiff's report and the VE's testimony that Plaintiff's work as a cleaner was unskilled, and determined that the assessed RFC would allow Plaintiff to perform his PRW as a cleaner. *Id.* at 14.

Pursuant to 20 C.F.R. § 404.1520(a)(4)(iv), "[i]f you can still do your past relevant work, we will find that you are not disabled." SSR 82-62 sets forth the procedures the Social Security Administration ("SSA") uses at step four of the sequential analysis when determining whether the claimant's RFC permits him to return to his PRW. The ALJ must consider whether a claimant has the RFC to "meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy)," and, if the claimant can return to his PRW, he may be found "not disabled." SSR 82-62. The Ruling provides the following detail regarding what an ALJ is to consider in the decision:

> Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of

the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.

The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

*Id.*

"In reviewing disability claims, the Administrative Law Judge must determine precisely the activities involved in the claimant's former job or occupation and the activities that the claimant is capable of performing. *Harris v. Secretary, Dept. of Health and Human Services*, 866 F.2d 1415 (Table), 1989 WL 7013 at *2 (4th Cir. 1989) *citing Parker v. Harris*, 626 F.2d 225 (2d Cir. 1980).

Plaintiff testified that he was unable to perform his PRW because of the unpredictability of his panic attacks and the fact that he felt drained after experiencing a panic attack. Tr. at 71. Plaintiff testified that he stopped working because he had been performing his job during hours when the building was unoccupied, but he was told by his supervisor that he would have to come in earlier. Tr. at 79. He described an argument with his supervisor and stated that he quit and ran away. Tr. at 80. Plaintiff also stated that he had previously "broke down plenty of times at work" and in front of his supervisor. *Id.*

The ALJ found that Plaintiff was capable of performing past relevant work as a cleaner/janitor and that such work did not require the performance of work-related

activities precluded by the claimant's RFC. Tr. at 25. The ALJ further provided "[t]he undersigned accepts the vocational expert's testimony." Tr. at 26. "In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as generally performed." *Id.*

The undersigned recommends a finding that the ALJ failed to adequately consider Plaintiff's ability to perform his PRW in accordance with the requirements of SSR 82-62. In *Harris*, the Fourth Circuit remanded the case because the ALJ's decision was devoid of reference to or discussion of the plaintiff's explanation as to why he was unable to perform his past relevant work. *See* 1989 WL 7013 at *2. In *Nesmith v. Astrue*, C/A No. 1:10-2359-SVH, 2012 WL 13767 (D.S.C. Jan. 4, 2012), this court also remanded the claim where the ALJ failed to discuss the plaintiff's statement regarding the requirements of her PRW. The ALJ's decision in this claim similarly lacks consideration of Plaintiff's explanation for his inability to perform PRW. Plaintiff stated he experienced panic attacks that drained him and would cause him to miss work or be off task. *See* Tr. at 71. He also described a past work experience in which he had difficulty interacting with co-workers and supervisors, was unable to work around others, and demonstrated behavioral extremes. *See* Tr. at 79–80. Although the ALJ assessed an RFC that included multiple restrictions based on Plaintiff's psychologically-based symptoms, none of the restrictions imposed by the ALJ precisely addressed Plaintiff's explicit statements regarding his inability to perform PRW. Because SSR 82-62 requires a careful appraisal of Plaintiff's statements as to which PRW requirements can no longer be met and the reasons for his

inability to meet the requirements, the ALJ's failure to address Plaintiff's explanation warrants remand.

### 3.    New Evidence Submitted to Appeals Council

Plaintiff argues that the Appeals Council erroneously failed to evaluate Dr. Wiley's opinion of November 30, 2012, which related to the period before the ALJ's decision. [ECF No. 18 at 16–17].

The Commissioner argues that the new evidence did not warrant review of the ALJ's decision. [ECF No. 20 at 14]. The Commissioner maintains that only the September 12, 2012, record was relevant to the period before the ALJ's decision and that the Appeals Council correctly determined that it was not material because it would not render the ALJ's decision contrary to the weight of the evidence. [ECF No. 20 at 15].

The regulations "specifically permit claimants to submit additional evidence, not before the ALJ, when requesting review by the Appeals Council." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer*, 662 F.3d at 705, *citing Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). If the new and material evidence relates to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. 20 C.F.R. § 970(b).

The Fourth Circuit's decision in *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340–41 (4th Cir. 2012), suggests that evidence created after the ALJ's decision may be considered as new and material evidence and given retrospective consideration under certain circumstances. While *Bird* specifically addressed evidence created after a claimant's date last insured, this court has suggested its holding extends to situations in which evidence arises after the date of an ALJ's decision, but before the Appeals Council makes a decision to grant or deny review. *See Dickerson v. Colvin*, C/A No. 5:12-33-DCN, 2013 WL 4434381, at *14 (D.S.C. Aug. 14, 2013) (holding that a medical opinion dated more than a year after the ALJ's decision was new and material evidence that warranted remand); *see also Evans v. Colvin*, C/A No. 8:13-1325-DCN, 2014 WL 4955173, at *28 (D.S.C. Sept. 29, 2014) (holding that new evidence did not require reconsideration of the ALJ's decision because the new evidence did not appear to have any bearing upon whether the plaintiff was disabled during the time period relevant to the ALJ's decision).

The undersigned recommends a finding that the Appeals Council erred in failing to remand the claim based on new and material evidence. Although Dr. Wiley's letter was written nearly two months after the ALJ's decision was issued, the letter purported to characterize Plaintiff's functional ability during the relevant period and noted that Plaintiff had "shown a poor response to treatment and a worsening of his social anxiety and Agoraphobia since at least April 4, 2011." *See* Tr. at 407. The letter also addressed the GAF score of 60 assessed during Dr. Wiley's initial evaluation on December 7, 2010, indicating that Plaintiff's symptoms had shown minimal improvement in spite of

counseling and medication and that his recent GAF score was in the 45–50 range. *Id.* Dr. Wiley's explanation for the inconsistency between the initial GAF score and his subsequent RFC assessment seems particularly relevant in light of the ALJ's emphasis on the GAF score of 60 as a reason for rejecting Dr. Wiley's opinion. *See* Tr. at 25. Therefore, because Dr. Wiley's opinion related to the period before the ALJ's decision and because there was a reasonable possibility that it might have changed the outcome, the Appeals Council erred in failing to remand the claim to the ALJ for consideration of the new evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

December 2, 2014                          Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).